**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Peter K. Naki,<br><br>                    Plaintiff,<br><br>v.<br><br>Hawaii, State of, et al.,<br><br>                    Defendants. | No. CV-13-02189-PHX-JAT<br><br>**ORDER** |

Before the Court are Defendant's *Daubert* Motion to Exclude Plaintiff's Human Factors Expert Joellen Gill, (Doc. 107), and Defendant's Motion for Summary Judgment, (Doc. 108). The Court now rules on the motions.

**I.      Background**

This case arises out of an alleged fall Plaintiff took from a top bunk at Saguaro Correctional Center ("SCC"). The inmates' bunk beds in SCC are built into the cell wall. (Defendant Corrections Corporation of America's Statement of Facts in Support of Motion for Summary Judgment, Doc. 109 ("DSOF") at ¶ 1); (Plaintiff's Controverting Statement of Facts in Support of Plaintiff's Memorandum in Opposition to Defendant Corrections Corporation of America's Motion for Summary Judgment, Doc. 115 ("PCSOF") at ¶ 1). The top bunk is approximately 56 inches (4'8") from the floor and 40

inches (3'4") above the lower bunk. (DSOF at ¶ 2); (PCSOF at ¶ 2). The cell bunks at SCC are not fitted with ladders or side guard rails for safety and security purposes. (DSOF at ¶ 3); (PCSOF at ¶ 3).

Plaintiff, who is approximately fifty-nine inches tall (4'11"), was assigned to a top bunk several times during his incarceration, including the time period of his alleged fall. (DSOF at ¶ 13); (PCSOF at ¶¶ 13, 54). Plaintiff alleges that on December 30, 2010, he "was using the stacked locker crates to descend from the top level of his assigned bunk bed when the crates collapsed," causing him to fall and resulting in a broken forearm and injured forehead. (DSOF at ¶¶ 39, 48); (PCSOF at ¶ 39, 48).

Of Plaintiff's claims, only his negligence and § 1983 Eighth Amendment claims remain. Plaintiff's theory in both claims is that Defendant should have installed ladders or other assistive devices on the bunk beds to assist inmates in ascending and descending to and from the top bunks. Defendant has moved to exclude Plaintiff's proffered expert witness, Joellen Gill, and for summary judgment on both of Plaintiff's remaining claims. Both motions are fully briefed.[1]

**II.   Defendant's Motion to Exclude Plaintiff's Expert**

Federal Rule of Evidence 702 provides,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of

---

[1] Because both the parties submitted memoranda discussing the law and evidence in support of their positions and oral argument would not have aided the Court's decisional process, the court denies Defendant's request for oral argument in its motion for summary judgment. *See, e.g.*, *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir. 1991). Additionally, the Court finds that it has "an adequate record before it to make its ruling" without holding a *Daubert* evidentiary hearing. *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138–39 (9th Cir. 2002).

- 2 -

the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ("*Daubert I*"), the Supreme Court held that Rule 702 imposes a special gatekeeping obligation upon a trial judge to make a preliminary assessment of the admissibility of expert scientific testimony. Specifically, the Court held that under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589.

In making this determination, the trial court engages in a two-part inquiry. First, the court must determine whether the expert is qualified to testify as an expert—that is, "the individuals whose testimony is being proffered are experts in a particular [] field." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). Second, the court must determine whether the proffered expert testimony is relevant, "i.e., that it logically advances a material aspect of the proposing party's case." *Id.* Essentially, under *Daubert*, the trial court's task "is to analyze not what experts say, but what basis they have for saying it." *Id.* at 1316. Because the Court finds, as explained below, that Ms. Gill's proffered testimony does not satisfy the second *Daubert* prong, the Court assumes without deciding that Ms. Gill is qualified to testify as an expert under the first *Daubert* prong.

Under the second *Daubert* prong, the trial court must ensure that the proffered expert testimony is reliable. Generally, to satisfy Rule 702's reliability requirement, "the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316. Toward this end, the Supreme Court in *Daubert I* set forth the following factors for the trial court to consider when assessing the reliability of proffered expert testimony. First, "a key question to be answered in determining whether a theory or technique is [] knowledge that will assist the trier of fact will be whether it can be (and has been) tested." 509 U.S. at 593. Second, the Court looks at whether the theory or technique has been subjected to peer review and

- 3 -

publication. *Id.* Because publication in a peer-reviewed journal increases the likelihood that substantive flaws in the technique will be detected, "[t]he fact of publication (or lack thereof) . . . will be a relevant, though not dispositive consideration in assessing the scientific validity of a particular technique or methodology on which an opinion in premised." *Id.* at 594. Third, "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation[.]" *Id.* (internal citations omitted.) Fourth, the Court considers the degree of acceptance of the method or technique within the relevant scientific community. *Id.* In engaging in this analysis, the trial court should be mindful that:

> The inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id.* at 594–95 (footnotes omitted).

It is also well-settled that the four *Daubert* factors - testing, peer review, error rates, and acceptability in the relevant scientific community - are merely illustrative, not exhaustive, and may be inapplicable in a given case. *Daubert II*, 43 F.3d at 1317. For instance, the Ninth Circuit has advised that a trial court may also question whether the expert is proposing to testify about matters "growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying" as another significant inquiry weighing on reliability. 43 F.3d at 1317. "That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" *Id.*

Accordingly, "[e]stablishing that the an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review are the two principal ways the proponent of expert testimony can show that the evidence

- 4 -

satisfies the first prong of 702." *Id*. at 1318. Failing this, the proponent may attempt to meet this burden through the testimony of its expert. *Id.* at 1319. "For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some objective source - a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like - to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* In other words, "the party proffering the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has chosen a reliable scientific method and followed it faithfully." *Id.* at 1319 n.11. Offering the expert's qualifications, conclusions, and an assurance of reliability is insufficient. *Id.* at 1319.

In *Kumho TireCo., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that the trial judge's general gatekeeping obligation outlined in *Daubert* not only applies to expert scientific testimony, but to all expert testimony. It reasoned that neither the language of Rule 702 nor the evidentiary rationale supporting the Court's decision were limited to "scientific" knowledge, and that making the trial court's gatekeeping obligation dependent upon a distinction between "scientific" and "other specialized" knowledge would be unworkable. *Id.* at 148. Accordingly, the Court made clear that "*Daubert*'s general principles apply to the expert matters described in Rule 702." *Id.* at 149. Further, the Court held that in determining the admissibility of proffered expert testimony, and in particular, in assessing the reliability of the grounds for such testimony, the trial court *may* consider one or more of the reliability factors identified in *Daubert*. Thus, when assessing the reliability of a non-scientific expert's testimony, the trial court may ask, for example, how often an expert's skill or experienced-based methodology produces erroneous results, whether the method is generally accepted in the relevant expert community, or whether the expert's preparation would be recognized as acceptable in the expert's field. *Id.* at 151. While the trial court should consider the *Daubert* factors when they would be reasonable measures of reliability, the trial court retains the

discretion to tailor its reliability determination to suit the facts of a particular case. *Id.* at 152–53 (noting that the law grants the trial judge "broad latitude" in fashioning its reliability inquiry under *Daubert*).

After reviewing Ms. Gill's report and response to Mr. Sullivan's report, the Court concludes that Ms. Gill's expert testimony is not admissible because it is unsupported by any reasoning, data, facts, principles, techniques, or methods. In the first section of Ms. Gill's analysis, she explains that falls are the "second leading cause of accidental injuries and death in the United States" and that "in 1989 about 34,000 bunk bed-related injuries were treated in U.S. hospital emergency rooms." (Doc. 107-1 at 6). Then, with no explanation, Ms. Gill concludes that "[a]n a priori analysis would have revealed the short stature of Mr. Naki and the need to assign him a lower bunk." (Doc. 107-1 at 6). Even assuming that Ms. Gill's twenty-five year-old statistics accurately describe the annual number of bunk bed falls across the nation, there is no logical connection between national annual bunk-bed fall rates and the risk posed by Plaintiff's ladder-less bunk bed. Ms. Gill provides no study, publication, or other acceptable basis for concluding that a person of Plaintiff's height, age, strength, and agility cannot safely access and exit an upper bunk. Thus, Ms. Gill's conclusion that Defendant should have discovered that Plaintiff needed a bottom bunk is not "the product of reliable principles and methods." Fed. R. Evid. 702.

The next portion of Ms. Gill's report criticizes Defendant's "post hoc analysis." In this section, Ms. Gill criticizes Defendant for not adding ladders to the beds or moving Plaintiff to a bottom bunk after it learned of top-bunk-related injuries at SCC and other facilities. (Doc. 107-1 at 6). Ms. Gill, however, does not discuss the details of the other accidents at all. For example, there is no indication how often the other injuries occurred, how serious those injuries were, or whether the injured inmates' negligence or disabilities contributed to the injuries. Nor does Ms. Gill provide any scientific publication, data, or analysis to help the jury decide whether the other injuries were indicative of a substantial risk. Rather, Ms. Gill's conclusion that Defendant should have added ladders or assigned

1   Plaintiff a bottom bunk is derived purely from the fact that other injuries occurred related
2   to top bunks at prison facilities. Under *Daubert* and Rule 702, this is not a sufficient basis
3   to support Ms. Gill's conclusion.

4   The final section of Ms. Gill's report criticizes Defendant's "plan development."
5   (Doc. 107-2 at 7). Ms. Gill instructs that once a hazard has been identified, "the next
6   component in a safety and risk management program is to develop a plan to mitigate the
7   identified hazards." (*Id.*). In support of her conclusion that Defendant's plan should have
8   included "a ladder for the inmates to access the upper bunks," Ms. Gill cites two
9   publications that describe safety standards for bunk beds. These publications, however,
10  explicitly state that they are not intended for institutional settings. (Doc. 107-2 at 2)
11  ("This consumer safety specification is intended to minimize accidents to children
12  resulting from normal use and reasonably foreseeable misuse or abuse of bunk
13  beds. . . . The consumer safety specification does not address bunk beds for institutional
14  use (for example in prisons, military facilities, dormitories, and so forth)."); (Doc. 107-3
15  at 4) ("This part of ISO 9098 specifies requirements relating to the safety of bunk beds
16  for domestic use. It is in particular intended to minimize the risk of accidents to
17  children."). Thus, by their own terms, these studies are inapplicable to a case involving
18  bunk beds in an adult prison and are therefore not reliable as applied to the present case.

19  Finally, near the close of Ms. Gill's report, she concludes that "[c]learly
20  [Plaintiff's] short stature should have been considered in a Special Needs Treatment
21  Plan." (Doc. 107-1 at 7). Once again, however, Ms. Gill cites no study, method, statistic,
22  facts, data, or any other basis for this conclusion. Indeed, she does not explain her
23  conclusion at all. Under Rule 702, the Court cannot allow Ms. Gill to testify to an opinion
24  without even a token attempt at explaining her reasoning.

25  In sum, the Court could find nothing in Ms. Gill's report that explains the basis for
26  her conclusion that Defendant should have either installed a ladder or assigned Plaintiff a
27  lower bunk. The only publications she cites apply only to domestic use of bunk beds by
28  children, and one expressly excludes application to institutional settings such as prisons.

*Id.* at 1319. Without an explanation as to "precisely how [Ms. Gill] went about reaching [her] conclusions," the Court has "been presented with only the expert['s] qualifications, [her] conclusions, and [her] assurances of reliability. Under *Daubert*, that's not enough." *Daubert II*, 43 F.3d at 1319. Accordingly, the Court must fulfill its gatekeeping responsibility and preclude Ms. Gill's testimony.

## III. Defendant's Motion for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support that assertion by "citing to particular parts of materials in the record," including depositions, affidavits, interrogatory answers or other materials, or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a

1 material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id.*

### A. Negligence Claim

> A negligence action may be maintained only where there is a duty or obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct to protect others from unreasonable risks of harm. *Markowitz v. Arizona Parks Board,* 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985). A defendant is negligent when his conduct deviates from the recognized standard. *Prosser and Keeton on The Law of Torts* § 30 at 164 (W. Keeton 5th ed. 1984). In the ordinary negligence action, the standard imposed is that of the conduct of a reasonably prudent man under the circumstances. *Paul v. Holcomb,* 8 Ariz.App. 22, 24, 442 P.2d 559, 561 (1968).

*Bell v. Maricopa Med. Ctr.*, 755 P.2d 1180, 1182 (Ariz. Ct. App. 1988).

Importantly, under Arizona law, when "the alleged lack of care occurred during the professional or business activity, the plaintiff must present expert witness testimony as to the care and competence prevalent in the business or profession." *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 742 P.2d 808, 816 (Ariz. 1987). Courts have applied this principle to prison operations. *E.g.*, *Seawright v. State*, No. CV 11-1304-PHX-JAT, 2013 WL 4430928, at *1 (D. Ariz. Aug. 16, 2013); *Porter v. Arizona Dep't of Corr.*, No. 2:09-CV-2479-HRH, 2012 WL 7180482, at *3–*5 (D. Ariz. Sept. 17, 2012). As noted above, however, Plaintiff's expert testimony is not admissible under Federal Rule of Evidence 702. Plaintiff therefore cannot establish the standard of care, and Defendant is entitled to summary judgment on Plaintiff's negligence claim.

### B. Eighth Amendment Claim

"[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment . . . ." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). (quoting *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 199–200 (1989)). "It is not, however, every injury . . . that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Rather, a prison guard's liability under the Eighth Amendment attaches only when two requirements are met:

> First, the deprivation alleged must be, objectively, "sufficiently serious"; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.
>
> The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety . . . .

*Id.* (internal citations omitted). The Supreme Court has made clear that this standard "entails something more than mere negligence." *Id.* at 835.

Plaintiff relies heavily on his expert's opinion to prove that his bed posed a substantial risk of serious harm. *See* (PCSOF at ¶¶ 4–9) (citing expert reports for the proposition that "bunk beds without ladders or any proper means to ascend/descend to/from the top bunk is unsafe and an unreasonably dangerous condition"); (PCSOF at ¶ 10) (citing expert report for the proposition that "[t]he layout of the bunk bed without any proper assistive device is unsafe"); (PCSOF at ¶ 11) (same); (PCSOF at ¶ 36) (same). As explained above, however, Plaintiff's expert's testimony is not admissible, so Plaintiff must turn to other evidence to show a substantial risk of serious harm.

The only other evidence Plaintiff presents in this regard are reports of his own injury, reports of four other inmates injuring themselves getting in and out of a top bunks in 2010, and his own statement that he had "a hard time" and "slipped a few times" getting in and out of his bunk. (PCSOF at ¶¶ 40, 64–65, 73); (Doc. 115-1); (Doc. 115-2 at 3, 5, 6). But this evidence, in its proper context, fails to prove that Plaintiff's bed posed a *substantial* risk of *serious* harm. First, by Plaintiff's own admission, the few times he "slipped" while getting in and out of bed were "nothing serious." (Doc. 115-2 at 5). Moreover, in 2010, approximately 900 inmates assigned to top bunks accessed their beds approximately twice a day, meaning that inmates entered or exited top bunks approximately 657,000 times. (DSOF at ¶¶ 41–43); (PCSOF ¶¶ 40–43). Put another way, Plaintiff's evidence of five injuries requiring medical attention shows that inmates are injured seriously enough to visit the prison medical facilities approximately 0.000761% of the time they enter or exit the top bunk.

No reasonable jury could conclude that such a low injury rate, even combined with Plaintiff's statements that he had a "hard time" and "slipped a few times" accessing and exiting his bunk, is indicative of a *substantial* risk of *serious* harm. At best, Plaintiff's evidence shows that his bunk poses a "minor safety hazard[]," something the Ninth Circuit Court of Appeals has "found not to violate the Eighth Amendment." *Osolinski v. Kane*, 92 F.3d 934, 938 (9th Cir. 1996). This conclusion is bolstered by the fact that courts that have considered whether top bunks without ladders or other assistive devices violate the Eighth Amendment have overwhelmingly—if not uniformly—held that they do not. *See, e.g.*, *Hucker v. California Dep't of Corr.*, No. 1:09-CV-01262-MJS PC, 2010 WL 4904747, at *4 (E.D. Cal. Nov. 24, 2010) (". . . [I]t is to be noted that multiple courts have held that the failure of prison officials to equip a plaintiff's bunk with a ladder does not amount to the deprivation of "a minimal civilized measure of life's necessities."); *Grushen v. Hedgpeth*, No. C 12-1860 SI PR, 2012 WL 2590390, at *1 (N.D. Cal. July 3, 2012) ("Bunk beds—even those without ladders and/or handrails—do not satisfy the objective prong necessary for an Eighth Amendment violation."); *Hiscox v. Martel*, No.

CIV S-10-0467 JAM CK, 2011 WL 5241277, at *3 (E.D. Cal. Nov. 1, 2011) (". . . [P]rison officials' failure to provide a ladder or other safety features may not reasonably be characterized as a deliberate deprivation of a human need or as a condition that placed plaintiff's health or welfare in imminent danger."); *Connolly v. County of Suffolk*, 533 F.Supp.2d 236, 241 (D.Mass.2008) ("[T]he failure of prison officials to equip his bunk bed with a ladder simply does not amount to a deprivation of 'a minimal civilized measure of life's necessities.'"); *Wilson v. State*, No. CIV.A. 7:00-CV-00966, 2002 WL 31499736, at *1 (W.D. Va. May 6, 2002) (no Eighth Amendment violation when prison "failed to provide ladders, steps and/or safety bars for inmates assigned to top bunks, even after Wilson informed them of his falls and resulting injuries").

Therefore, because Plaintiff has failed to show a genuine issue of material fact regarding the first prong of the deliberate indifference standard, Defendant is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

**IV. Conclusion**

Accordingly,

**IT IS ORDERED** that Defendant's *Daubert* Motion to Exclude Plaintiff's Human Factors Expert Joellen Gill, (Doc. 107), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment, (Doc. 108), is **GRANTED**. The Clerk of the Court shall enter judgment in favor of Defendant and dismiss the case with prejudice.

Dated this 4th day of August, 2015.

*James A. Teilborg*
Senior United States District Judge